UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,          Case No. 1:16-cr-20625

v.                   Honorable Thomas L. Ludington

D–1 DENIS BURKE,
D–3 PARISVILLE DAIRY
D-4 DUNGUNSTOWN DAIRY

    Defendants.

_____/

# ORDER DENYING MOTION FOR DISCOVERY CONCERNING SELECTIVE PROSECUTION, DENYING MOTION TO DISMISS INDICTMENT WITHOUT PREJUDICE AND AMENDING SCHEDULING ORDER

On September 14, 2016, an indictment was returned which charged Defendants Denis Burke, Madeline Burke, Parisville Dairy, and Dunganstown Dairy in several counts related to the employment of illegal aliens on the dairy farms. ECF No. 1. Madeline Burke has since pleaded guilty. ECF No. 45. On May 30, 2017, the two motions were filed. ECF Nos. 40, 41. In the first motion, the Defendant Denis Burke requests additional discovery to explore whether the Government is selectively prosecuting only dairy farmers of foreign origin for employing illegal aliens. In the second, the three remaining Defendants seek dismissal of the indictment because the Government has deported the "alien witnesses whose testimony would be exculpatory." ECF No. 41 at 1. On August 15, 2017, the Court held a hearing on the two pending motions. For the reasons stated below, both motions will be denied.

**I.**

**A.**

Defendant Denis Burke (and his wife Madeline Burke) own and operate the Parisville and Dunganstown Dairy farms. The Burkes are Irish citizens. In the indictment, the Government alleges that the Defendants conspired to cause "illegal aliens to be transported to their dairy farms in Huron and Tuscola counties, to obtain the services of the illegal alien workers." Superseding Indict. at 2, ECF No. 23. The Government further alleges that the Defendants "failed to conduct the inquiries necessary to fully and accurately complete Employment Eligibility Forms (I-9 forms) for newly hired employees, as required by law." *Id.* Defendants also allegedly "continued to employ and re-hire[] workers after having notice that the employees were working under invalid social security numbers" and further "agreed that other members of the conspiracy should help the illegal alien workers cash their paychecks and shop for food, cloths, and other items." *Id.* at 3.

**B.**

On May 22, 2013, Immigration Customs Enforcement (ICE) agents executed search warrants on the Parisville Dairy and Dunganstown Dairy Farms. The agents seized employment records, cell phones, and a laptop. The agents also took fourteen employees, all undocumented immigrants, into custody. The employees were interviewed by ICE agents. In an investigation report prepared on May 22, 2013, ICE agents recorded statements made by the employees. In each interview, the employees were questioned regarding Defendant Denis Burke's knowledge of their undocumented status.

A number of the employees indicated that Defendant Burke was not aware of their undocumented status. Javier Gallegos-Munoz stated:

> I was hired by the boss and the manager; they did not know that I was not authorized to work. Denis is my supervisor. I filled out an I-9. I showed a permanent resident and socials security card – fake – got them in Indiana. My

employer didn't ask me if I could legally work and I didn't tell him that I could not.

May 22, 2013 at 2, ICE Report, ECF No. 41, Ex. 1.

Manuel Leuvano Martinez explained that "[o]wners did not ask for documentation or ask to fill out documents. . . . My employer didn't ask me if I could legally work and I didn't tell him that I could not." *Id.* at 3. Jose Hernandez-Lara stated that "I did not complete an I-9 or show documents. My employer didn't ask me if I could legally work and I didn't tell him that I could not." *Id.* Juan Alberto Hernandez-Reyes explained:

> A Mexican guy, Jose Gaitan, hired me. . . . He told me he was illegal. . . . He didn't know I wasn't authorized to work in the U.S. . . . Everyone working is illegal. I filled out the upper part of the I-9 and gave it to [my supervisor]. [Redacted] got me a green card and social security card – I paid $200. I showed those documents. My employer didn't ask me if I could legally work and I didn't tell him that I could not.

*Id.* at 3–4.

Rodolfo Christobal-Juarez asserted that "Denis hired me. He didn't know I was unauthorized to work because of my fake ID." *Id.* at 4–5. Heriberto Estupian-Renteria stated that "Denis hired me and doesn't know I'm illegal – I told him that I was legal, he thinks that I have papers." *Id.* at 5. According to Silverio Eliseo Lopez-Juarez:

> I am not paid differently than employees who are authorized to work in the U.S. A friend in Grand Rapids, Michigan told me about the job. My boss, Denis, hired me. I did not complete an I-9 form and I was not asked to show documents. My employer never asked me if I could legally work in the U.S. and I never told him I could not.

*Id.* at 6.

Jose Dejesus-Guerra stated that "he gave Burke fake ID and wasn't sure if Burke knew that he was illegal or not." *Id.* Christobal Justiano Augustin-Miranda explained that "Denis Burke hired me. I don't know if he knew I was not authorized to work in the U.S. Denis Burke

asked me to complete an I-9. I showed him documents in the name of Fedelino Lopez. . . . My employer never asked me if I could legally work in the U.S. and I never told him I could not." *Id.* at 7. Mynor Augustin-Miranda asserted that "Denis Burke hired me. He didn't know I was not authorized to work in the U.S. No one asked me to complete an I-9 or for documents. My employer never asked me if I could legally work in the U.S. and I never told him I could not." *Id.*

However, some of the employees indicated that Burke was aware of the undocumented status of the workers and/or treated documented and undocumented employees differently. Sergio Hurtado-Delgado asserted that "[t]he ones who have papers are paid more. I was hired by Denis Burke. Denis knew I was not authorized to work." *Id.* at 3. Vitor Salvador Lopez-Juarez stated that "[m]y employer knew I was not authorized to work. I did not fill out an I-9 but wrote on a piece of paper 'illegal.' My employer did not ask me if I could legally work and I did not tell him that I could not. The majority of the workers are illegal but some have papers." *Id.* at 4. Arelio Cardenas Lopez explained:

> No money is held from my paycheck and I am not paid differently than employees who are authorized to work in the U.S. A friend in Grand Rapids, Michigan told me about the job. Denis hired me and knew that I was illegal but I did not tell him. My employer filled out the I-9 for me. I showed a green card and social security card that I bought in Grand Rapids. My employer never asked me if I could legally work in the U.S. and I never told him I could not.

*Id.* at 5–6.

## II.

In the first motion, Defendant Burke requests an order "requiring production of materials relevant to his claim that the government selected him for prosecution because of his national origin." Mot. Disc. at 1, ECF No. 40. In the second motion, all remaining Defendants seek dismissal of the indictment "due to the Government's deportation of the alien witnesses whose

testimony would be exculpatory and who would have formed the core of the defense." Mot. Dismiss Indict. at 1, ECF No. 41. The motions will be addressed in turn.

A.

A selective-prosecution claim challenges the Attorney General's "'broad discretion' to enforce the Nation's criminal laws" and thus implicates "a 'special province' of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985) and *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). Prosecutors have considerable "latitude" to make charging decisions and as such there is a "'presumption of regularity'" when reviewing those decision. *Id.* (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926)). Accordingly, the standard for proving a selective prosecution claim is "demanding" and, further, there is a "'background presumption' that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463–64 (quoting *United States v. Mezzanatto*, 513 U.S. 196, 203(1995)) (internal citations omitted). Normally, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

However, "a prosecutor's discretion is 'subject to constitutional constraints,'" including the "equal protection component of the Due Process Clause of the Fifth Amendment." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). The Fifth Amendment prohibits prosecutors from deciding whether to prosecute based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A selective prosecution claim implicates "ordinary equal protection

standards," which require the movant to show that the challenged prosecutorial decision "had a discriminatory effect and . . . was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). To establish discriminatory effect, "the claimant must show that similarly situated individuals of a different [national origin] were not prosecuted." *Armstrong*, 517 U.S. at 465. To establish discriminatory intent, the claimant "must show that the prosecutorial policy was motivated by . . . animus" based on national origin. *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998).

Here, Burke is not yet seeking dismissal of the indictment based on a selective prosecution theory. Rather, Burke is only requesting "production of materials relevant to his claim that the government selected him for prosecution because of his national origin." Mot. Disc. at 1. A motion for discovery related to a selective prosecution allegation is necessarily governed by a lesser standard. But because discovery "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the standard is "correspondingly rigorous." *Armstrong*, 517 U.S. at 468. Specifically, the defendant must produce "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). The *Armstrong* Court specifically held that defendant must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id.* at 469. In *Armstrong*, the Court held that a study relied on by the defendant did not satisfy the standard necessary to justify discovery because "[t]he study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.* at 470.

In support of his request for discovery, Burke contends that the present prosecution is the second prosecution of foreign-born dairy farm owners in the Eastern District of Michigan in the last eight years.[1] Burke further asserts that "the government has never charged any other dairy farmers in the Eastern District or Western District of Michigan under § 1324 for their hiring practices." Mot. Disc. at 4. Because, according to Burke, more than 50% of United States dairy farms employ undocumented workers, he contends that the lack of prosecutions against domestic dairy farmers is indicative of discrimination. *See id.* (citing Goodman Art., ECF No. 40, Ex. 4). Burke further notes that federal prosecutors recently charged and convicted Irene Maria Martinez Gonzales with bringing in and harboring illegal aliens. *See United States v. Martinez Gonzales*, Case No. 16-cr-20146 (E.D. Mich.). At trial, testimony revealed that Ms. Martinez Gonzales transported numerous undocumented workers to dairy farms, at the request of the dairy farmers. The Department of Homeland Security special agent who testified before the grand jury and at Ms. Martinez Gonzales's trial asserted that she brought in undocumented workers for approximately 15 local dairy farms. The present prosecution appears to have arisen out of the same investigation that resulted in Ms. Martinez Gonzales's conviction, but no other local dairy farmers have been charged.

Burke contends that this evidence—that two prosecutions have been brought against foreign-born dairy farmers, that no prosecutions have been brought against domestic-born dairy farmers, and that there is evidence known to the Government that some domestic-born dairy farmers do knowingly employ undocumented immigrants—is sufficient to provide "a credible showing of different treatment of similarly situated persons." *Armstrong*, 517 U.S. at 470.

1.

---

[1] Besides this case, the other prosecution identified by Burke is *United States v. Verhaar*, Case No. 10-cr-20562 (E.D. Mich). The Verhaars were Dutch citizens who were similarly charged, in 2010, with conspiracy to harbor and conceal illegal aliens who were employed on their dairy farm.

To begin with, Burke has the burden of specifically identifying similarly situated individuals who were not charged. "[R]aw statistics regarding overall charges say nothing about charges brought against similarly situated defendants. *United States v. Bass*, 536 U.S. 862, 864 (2002) (explaining that "nationwide statistics demonstrating that '[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites' and that the United States enters into plea bargains more frequently with whites than it does with blacks" was insufficient specific to warrant further discovery) (quoting *United States v. Bass*, 266 F.3d 532, 538 (6th Cir. 2001)).

In *United States v. Thorpe*, the Sixth Circuit held that no discovery should have been ordered because Thorpe failed to present "even 'some evidence' tending to show discriminatory effect." 471 F.3d 652, 659 (6th Cir. 2006). In *Thorpe*, the defendant was relying on Federal Public Defender reports which "demonstrated that a large number for firearm-related prosecutions . . . had been pursued against African-Americans." *Id.* at 658. Evidence at that level of generality was insufficient to provide "some evidence" that similarly situated defendants had been treated differentially. Importantly, the *Thorpe* Court also confirmed that "'[m]erely demonstrating that better evidence cannot be obtained without discovery does not suddenly render otherwise insufficient evidence sufficient.'" *Id.* at 659 (quoting *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1071 (9th Cir.2003)).

The parties dispute how to define "similarly situated persons," but under either definition Burke has not presented sufficiently specific evidence of discrimination. The Government contends that "similarly situated persons" should be construed as all defendants charged under 8 U.S.C. § 1324. Def. Resp. Br. at 3, ECF No. 50. Burke contends that the Eleventh Circuit's definition should be adopted:

> [O]ne who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

*But see Thorpe*, 471 F.3d at 658–59 (finding that the class of similarly situated defendants was all those charged with the violation of the same specific federal statute). Burke thus argues that "the relevant 'similarly situated persons' in this case would therefore be those persons **employing** illegal aliens. Pl. Reply Br. at 3, ECF No. 53 (emphasis in original).

Relying on his proposed definition, Burke argues that the Government's prosecution of Ms. Martinez Gonzales (a domestic-born U.S. citizen) is not an example of a similarly situated person. The Eleventh Circuit's definition is reasonable (although the Sixth Circuit implicitly advanced an alternative definition in *Thorpe*),[2] but even under that standard Burke has not specifically identified similarly situated individuals that the Government chose not to prosecute.

Here, Burke has provided national statistics which suggest that a significant number of farm workers (and thus presumably dairy farm workers) are illegal aliens. Those statistics are insufficiently specific to indicate differential treatment of similarly situated individuals. Burke points to the unidentified 15 to 17 dairy farms that Ms. Martinez Gonzales supplied undocumented workers for as evidence of similarly situated Defendants who were not prosecuted. But no information has been provided regarding the citizenship of those other dairy farmers, the size of those dairy farms, the number of undocumented immigrants employed on those farms, whether the Government investigated the hiring practices of those farms, or the strength of the evidence of wrongdoing uncovered in any such investigation. There is thus no

---

[2] Under the definition used in *Thorpe*, Ms. Martinez-Gonzales, a domestic-born United States citizen, would qualify as a similarly situated person.

indication that the Government has gathered comparable evidence of wrongdoing by the other farmers. Burke has not even confirmed that those farmers are domestic-born citizens.[3] Absent more specific information, Burke has not adequately identified similarly situated individuals.[4]

**2.**

Even if Burke had shown that similarly situated individuals were treated differently, he has provided no evidence of discriminatory intent on the Government's part. *See Bass*, 536 U.S. at 863 (2002) (confirming that "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect *and discriminatory intent*") (emphasis added). The fact that the Government chose to prosecute one foreign-born dairy farm owner, out of seventeen farm owners (an unknown number of which may be domestic-born), is more likely to be coincidental rather than statistically-significant evidence of discrimination. *See Thorpe*, 471 F.3d at 662 (explaining that the defendant had not produced evidence of discriminatory intent because "the FDO Reports from Detroit and Flint, which document the

---

[3] The vague generalities upon which Burke's argument depends are demonstrated by the following passage from Burke's briefing:

> Looking to census information provided by government agencies, Michigan's foreign-born population accounts for approximately 7% of the overall Michigan population. Michigan actually has a lower percentage of immigrants in the overall population than the national average, which is currently 13%. When these statistics are applied to the fifteen or seventeen other dairy farmers pointed to by one of the facilitators in *U.S. v. Martinez-Gonzales* [sic], the chance that even *one* of the farmers is foreign-born is low.

Def. Reply. Br. at 5 (internal citations omitted) (emphasis in original).

Burke thus not only relies on general statistics that are not specific to the farmer context (much less dairy farmer context), but also implies that those generalized statistics can be construed as predictive of the makeup of the small, non-representative sample size of seventeen dairy farmers. This falls far short of affirmatively demonstrating that the Government declined to prosecute similarly situated farmers.

[4] At the hearing, the Government made several representations regarding the owners of those 15 to 17 farms. First, the Government explained that those 15 to 17 farms were owned by approximately nine different entities. And the Government further alleged that, of those nine entities, only two are constituted of domestic-born farmers. This information is uncorroborated and thus not determinative. But, if true, it would affirmatively establish that no selective prosecution has taken place.

cases of only 68 individuals, "are based on a statistically unimpressive number of federal defendants") (quoting *United States v. Turner*, 104 F.3d 1180, 1185 (9th Cir. 1997)).

There are a myriad of reasons that the Government might have chosen to prosecute the Burkes but not (yet) the other farmers. Perhaps the Burke farms are significantly larger and employ more undocumented workers. Alternatively, the evidence that the Burkes knowingly violated federal law might be significantly stronger than the evidence obtained against other dairy farmers. At the motion hearing, the Government explained that the Burkes were originally investigated because of a February 2013 traffic stop. At the traffic stop, the officers interviewed Yolanda Stewart, the vehicle driver. Ms. Stewart later pleaded guilty to transporting and harboring unlawful aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and (B)(I). *See United States v. Stewart*, Case No. 16-20469, ECF No. 9. According to the plea agreement, Ms. Stewart had five passengers in her car when stopped. *Id.* at 4. All five passengers were employed on the same dairy farm and were illegal immigrants. *Id.* As stated in the plea agreement, "Stewart later was paid by the owner of the dairy farm to buy groceries for the remaining illegal workers on that farm. The farmer needed to have the remaining workers fed so the dairy farm could continue to operate, despite the loss of the five illegal workers arrested . . . on February 1, 2013." *Id.* According to the Government (and not denied by Defendants), those five workers were all employed on the Burke farms. The February 2013 traffic stop thus provides a plausible explanation for why the Burke farms were specifically investigated and further suggests that the Government likely has greater evidence of wrongdoing by the Burkes than other dairy farmers in the area.

It is axiomatic that the Government may selectively prosecute only the strongest cases. Burke argues that the Government has "relentlessly investigated and prosecuted persons of non-

U.S. origin" suspected of knowingly employing illegal aliens, but has only identified two such prosecutions over the past eight years. Two prosecutions in an eight year span falls short of providing prima facie evidence that the Government is specifically targeting foreign-born dairy farmers.

Thus, Burke has not met the "rigorous" standard which applies to his request for discovery on his selective prosecution claim. *Armstrong*, 517 U.S. at 468. He has identified other dairy farmers that may have employed undocumented immigrants, but only in vague and general terms. He has not provided any evidence to support his argument that the other farmers are domestic-born or that the Government has (or could have) collected comparable evidence of wrongdoing by those dairy farmers. And even if Burke had specifically identified similarly situated persons that were treated differently, he has provided no statistically significant evidence of animus or bias on the Government's part. This is not a case where the Government's interest in avoiding expenditure of resources and disclosure of prosecutorial strategy has been overcome by a showing of sufficient evidence of discrimination. *Id.* at 468–470. For that reason, Burke is not entitled to discovery on his selective prosecution claim.

**B.**

In the second motion, Defendants argue that the Government violated their Due Process rights under the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment when they deported illegal aliens who worked on the Burke farms. The Sixth Amendment guarantees that criminal defendants shall "have compulsory process for obtaining witnesses" favorable to their defense. U.S. Cont., Am. VI. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14,

19 (1967). If the Government deports individuals that could provide testimony favorable to the defendant, the defendant's constitutional rights may have been violated. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982). However, a defendant's constitutional rights have not necessarily been violated simply because the Government has deported potential witnesses. Rather, the defendant has the "duty to make some showing of materiality." *Id.* To demonstrate "that the government has violated his right of compulsory process, a defendant must first make an initial showing that the government has acted in bad faith." *United States v. Damra*, 621 F.3d 474, 489 (6th Cir. 2010). Second, the defendant must make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal,* 458 U.S. at 873. "[T]he defendant's unsupported word alone is not sufficient to demonstrate materiality and favorability where the defendant maintains only that the potential witness "could explain" or "might have testified" in some favorable fashion." *Damra*, 621 F.3d at 490.

Additionally, "sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873–74. Admittedly, defendants must be afforded some "leeway" because they "necessarily proffer[] a description of the material evidence rather than the evidence itself." *Id.* at 874. "Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." *Id.*

**1.**

Defendants have not met their burden of demonstrating that the Government has acted in bad faith here. The Sixth Circuit has not defined "bad faith" in this context. But, according to the

Ninth Circuit, the Government has deported potential witnesses in bad faith if "'the Government departed from normal deportation procedures' or . . . 'the Government deported [the potential witness] to gain an unfair tactical advantage of [the defendant] at trial.'" *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000). In the Seventh Circuit, bad faith exists if the Government deported a potential witness with "official animus" towards the defendant or in "a conscious effort to suppress exculpatory evidence." *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (internal citations omitted). *See also California v. Trombetta*, 467 U.S. 479, 488 (1984) (explaining that there was no evidence that exculpatory evidence was not preserved in bad faith because there was "no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence").

Defendants have not made an initial showing that the Government has acted in bad faith. To begin with, the Government contends that only three of the undocumented workers interviewed by ICE agents on May 22, 2013, have since been deported. *See* Gov. Resp. Br. at 4, ECF No. 55. In the Government's own words:

> The undersigned is informed that Javier Gallegos-Munoz was deported in June of 2013. Cristobal Augustin-Miranda, aka Justiano Agustin-Miranda, was removed in January of 2014. Arelio Cardenas Lopez was made subject to administrative removal in January of 2014. . . . However, the four other illegal immigrants previously employed by the defendants and named in the defendants' motion have not been deported by immigration authorities.
>
> The undersigned is informed that Mynor Agustin-Miranda was federally convicted of re-entry after deportation and made subject to deferred action on his removal order to make him available to testify at trial, but he later absconded. Rodolfo Christobal-Juarez was granted a voluntary departure but he has failed to leave the U.S. Christoba-Juarez therefore is considered to be an ICE fugitive.
>
> Heriberto Estipian-Renteria has been in the U.S. while awaiting processing of his application for a resident alien (green) card. However, he rather recently incurred a new, but not first, alcohol-related driving conviction. That conviction has, in turn, caused Estupian-Renteria's green card application to be delayed pending an administrative immigration hearing. As a result, unless he

> recently has been released on bond, Estupian-Renteria is in custody in the U.S. and his presence as a witness at trial can be secured by the defendants if they obtain a writ for him for that purpose.

*Id.* at 4–5.

Defendants argue that the Government acted in bad faith here because it knew "of the existence of evidence beneficial to Defendants' version of the facts" after the search warrants were executed, "but nonetheless permitted individuals with such evidence to be deported." Mot. Dis. At 4–5, ECF No. 41. But the Government has identified several employees who not only remain in the country but appear to be within easy access of a subpoena, given due diligence by the Defendants. In fact, Mr. Estupian-Renteria is currently in federal custody. Given the fact that several of the employees Burke has identified were *not* deported, the Government has not obtained an unfair tactical advantage. Likewise, there is no evidence that the Government has departed from normal deportation procedures. To the contrary, the fact that a number of undisputedly illegal aliens were permitted to remain in the country suggests the opposite.

Nevertheless, Defendants argue that any time the Government deports a material witness without giving defense counsel an opportunity to interview the witness, they have acted in bad faith. In support of that argument, Defendants rely upon *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012). In *Leal-Del Carmen*, the Ninth Circuit held that "[o]nce the government is aware that an alien has potentially exculpatory evidence, it must treat that person as a material witness and give defense counsel the opportunity to interview him and make a reasoned determination whether to seek his retention pending trial." *Id.* The *Leal-Del Carmen* Court confirmed that, if the Government "doesn't know what a witness will say, it doesn't act in bad faith by deporting him." *Id.* But the Ninth Circuit nevertheless held that, if the Government is aware the witness can provide exculpatory testimony, it cannot deport the witness "before

defense counsel has been retained or appointed and has had a fair opportunity to interview him."

*Id.*

The *Leal-Del Carmen* standard is dramatically broader than the standard articulated in *Pena-Gutierrez*, 222 F.3d at 1085 (9th Cir. 2000) and *Chaparro-Alcantara*, 226 F.3d at 624 (7th Cir. 2000). And, in *United States v. Gonzalez-Perez*, the Tenth Circuit expressly declined to adopt the *Leal-Del Carmen* standard:

> We decline to follow the Ninth Circuit. A per se rule requiring the government to always detain alien witnesses with potentially exculpatory information unduly interferes with the immigration laws enacted and to be executed by the political branches of our government. Moreover, a per se rule essentially presumes bad faith on the part of the government. The presence of bad faith must be proved, not its absence.

573 F. App'x 771, 777 (10th Cir. 2014).

For effectively the same reasons articulated by the Tenth Circuit, the rationale in *Leal-Del Carmen* cannot be adopted here. In *Damra*, the Sixth Circuit expressly confirmed that the defendant bears the burden of showing that the Government deported a potentially exculpatory witness in bad faith. *See* 621 F.3d at 489–90. Further, the defendant also bears the burden of showing that the "deported witness would have been both material and favorable to his defense." *Id.* at 490. If the *Leal-Del Carmen* rationale was adopted, then there would be no meaningful distinction between the two elements. Every time a defendant could show that the deported witness had material information (which the Government is aware of), then bad faith would be presumed. That rationale cannot be squared with the reasoning in *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), and *Damra*, 621 F.3d 474.

In short, there is no evidence suggesting that the Government departed from normal immigration procedures here.[5] And, furthermore, the fact that several witnesses with potentially exculpatory information remain in the country indicates that the Government has not obtained an unfair advantage.[6]

**2.**

Even if Defendants could establish that the Government acted in bad faith, they have not met their burden of making a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. Each of the employees identified by Defendants in their motion appears to have provided similar information to the ICE agents during their interview. In their reply brief, Defendants appear to admit that three of the workers with potentially exculpatory testimony remain available to testify. *See* Def. Reply Br. at 6 ("[F]our of these individuals are no longer available, and in fact, two have been deported by the government."). Defendants have made no effort to explain what non-cumulative information the unavailable witnesses could provide. Upon the Court's review of the ICE interview notes, all seven of the workers which Defendants identify appear to have provided substantially identical

---

[5] Defendants suggest in their briefing that the Government obtained an unfair advantage by "deporting witnesses that would have been useful to the defense and allowing others who were seemingly within the government's control to abscond." Def. Reply Br. at 5. Defendants thus appear to blame the Government both for deporting certain witnesses and *not* deporting others. The fact that several employees were not deported significantly undermines Defendants argument: if the Government was purposely acting in bad faith to deprive Defendants of exculpatory testimony, the Government would certainly have made sure that all potential witnesses were actually deported.

[6] At the motion hearing, Defendants argued that the Government acted in bad faith because Mynor Agustin-Miranda, who could provide favorable testimony to the Government, was given a deferred action to make him available to testify, while several undocumented workers who could have provided favorable testimony for the Defendants were deported. This dynamic does suggest that the Government made a conscious effort to suppress exculpatory evidence while preserving incriminating evidence. But, as explained in the next section, Defendants have not shown why the testimony of the deported witnesses was not cumulative to the testimony that can be provided by the witnesses which remain available.

answers at approximately the same level of detail. Absent some indication that the deported witnesses could have provided non-cumulative testimony, Defendants cannot show prejudice.

**3.**

Even assuming that the Government has acted in bad faith and that the deported witnesses could have provided material, non-cumulative testimony, Defendants have not shown that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Valenzuela-Bernal*, 458 U.S. at 874. In other words, if there is overwhelming evidence of guilt, then the deportation of several witnesses with potentially exculpatory information may have been harmless error. In *Valenzuela-Bernal*, the Supreme Court suggested that this inquiry is best made after trial, when all evidence of guilt has been presented. As such, Defendants' present motion is premature.

Because Defendants have not carried their burden on either of the first two prongs of the *Damra* test, the motion will be denied. But because Defendants may uncover more information that might substantiate their claims, and because the weight of the evidence presented at trial is relevant to the Court's consideration of this motion, the denial will be without prejudice. If, after trial, Defendants believe they can satisfy the three-part *Damra* test (by presenting additional information not known at the time the present motion was filed), a renewed motion for dismissal will be considered.

For another reason, future developments may require reconsideration of this issue. Defendants argued at the motion hearing that the Government has indicated its intention, via the Bill of Particulars provided on November 17, 2016, that it may seek enhancements at sentencing for each illegal immigrant employed by Defendants (assuming Defendants are convicted at trial). *See* ECF No. 30. In the Bill of Particulars, the Government identifies 127 illegal immigrants

allegedly employed by Defendants. If Defendants are convicted and the number of illegal immigrants knowingly employed by Defendants becomes a relevant factor at sentencing, then the Government's deportation of certain workers that may have provided exculpatory information will become relevant. In other words, Defendants have not shown that the testimony of the deported workers would be non-cumulative compared to the testimony of the available witnesses, *as regards Defendants' defense at trial.* But the Government's deportation of certain workers may have relevance at the sentencing stage. If Defendants are convicted and if the Government asserts that the deported employees should be individually counted for purposes of sentence enhancements, this issue may be revisited.

### III.

Accordingly, it is **ORDERED** that Defendant Burke's motion for discovery concerning selective prosecution, ECF No. 40, is **DENIED.**

It is further **ORDERED** that Defendants' motion to dismiss, ECF No. 41, is **DENIED without prejudice.**

It is further **ORDERED** that the Scheduling Order is **AMENDED as follows:**

| | |
|---|---|
| Plea Deadline: | **August 29, 2017** |
| Final Pretrial Conference: | **August 29, 2017, at 2:30 p.m.** |
| Jury Trial: | **September 12, 2017, at 8:30 a.m.** |

Dated: August 23, 2017                                    s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 23, 2017.

                                              s/Kelly Winslow
                                              KELLY WINSLOW, Case Manager